UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
TEVES REALTY, INC.,

                Plaintiff                **MEMORANDUM AND ORDER**
                                               Case No. 14-3226-FB-VMS

    -against-

KARL TERRY, THE CITY OF NEW
YORK, NEW YORK CITY
ENIVORMENTAL CONTROL
BOARD, NEW YORK CITY
DEPARTMENT OF FINANCE and
NEW YORK CITY PARKING
VIOLATIONS BUREAU,

               Defendant.
-------------------------------------------------x

*Appearances*:
*For the Plaintiff:*                            *For Defendant Karl Terry:*
SOLOMON ROSENGARTEN               AYMEN A. ABOUSHI
1704 Avenue M                                 The Aboushi Law Firm
Brooklyn, New York 11230                1441 Broadway, Fifth Floor
                                                      New York, New York 10018

**BLOCK, Senior District Judge:**

        In this diversity action, Teves Realty, Inc. ("Teves"), seeks to foreclose on commercial property owned by Karl Terry in Long Island City. A bench trial was held on June 9, 2023, and continued on March 7, 2024. The following represent the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## BACKGROUND

In denying the parties' motions for summary judgment, the Court observed that they "cannot agree on anything." *Teves Realty, Inc. v. Terry*, 2021 WL 3912297, at *1 (E.D.N.Y. Sept. 1, 2021). There are, however, a few undisputed facts.

In November 2009 Terry sought a $100,000 loan from Nechadim Corp. and its principal, Alexander Reich. Attorney Harold Schwartz drew up the paperwork, including a promissory note and mortgage on Terry's commercial property. Terry signed the documents, and the mortgage was recorded.

At some later point, Terry repaid the loan for "about 101,000 and change." Tr. of June 9, 2023, at 18. He did not receive a satisfaction of the mortgage, however, because he said, according to Schwartz, "he didn't want the interest to keep running," but that he would "be [b]ack for 200,000." *Id.* at 20.

What happened next forms the crux of the parties' dispute. According to Schwartz, Terry returned in May 2010 seeking a loan for $200,000. Reich again served as a lender, this time with a partner, Serle Selmon. Schwartz again prepared a note and mortgage, which Terry signed. Curiously, however, both refer to a loan of $100,000, not $200,000. Instead—again according to Schwartz—the parties agreed to an "extension" of the November 2009 loan, which

2

left the original mortgage in place as "a FIRST lien upon the premises situate in the Borough of Queens," and extended the repayment schedule until November 2010. Pl's. Ex. D.   This agreement "acknowledge[d] that the money Karl Terry gave back to Alexander Reich was don [sic] to stop the payment of interest on this mortgage."   Id.

Terry denies signing the agreement.   It bears the signature of a "Karl Terry," which appears similar to his signature on the other documents.   However, the notarization is dated May 16, 2010, while the document itself is dated May 18, 2010.   In addition, the notary was Schwartz; all other documents were notarized by another individual, apparently the title agent.

Then there is the matter of the funds.   On May 18, 2010, Schwartz wrote two checks from his attorney escrow account:   one for $91,864 payable to "Karl Terry," another for $80,000 payable to "Carl Terry."   A simple calculation reveals that Schwartz gave Terry $171,864 for what he claims was supposed to be a $200,000 loan.   He testified that Reich gave Terry a third check for $20,000, which Terry never cashed, but that would still fall short of the requested amount. The only explanation in the record is Terry's testimony that Reich told him "he's got to take something off the back end first."   Tr. of June 9, 2023, at 96.

To his credit, Terry acknowledges receiving both the $80,000 check and the $91,864 check. He further acknowledges cashing the latter. But he denies cashing the first and testified that Reich instead instructed him to give it to someone named Renee in his office. At the bench trial, Schwartz offered his checkbook entries and bank statements into evidence but was unable to produce the cancelled checks. The Court reopened the proceedings to allow him to do so when they were discovered, but that did not resolve the confusion. Although Terry's ostensible signature appeared similar, his name was spelled and signed incorrectly.

Whatever amount Terry received, he did not repay it. Reich signed over both notes and mortgages to Teves in January 2014. This action followed.

## FINDINGS OF FACT

As the Court explained in its summary judgment decision, "there are disputed issues of fact regarding (1) the status of the November 2009 note and mortgage, and (2) Teves's standing to enforce the May 2010 note and mortgage." *Teves*, 2021 WL 3912297, at *3. The Court has previously explained that Reich had authority to act for Selmon with respect to the May 2010 note and mortgage by virtue of being her partner. *See id.* at *2 ("Although the loan documents themselves do not reflect that Reich and Selmon were acting as partners, Reich has

4

attested that they were.")  There being no contradictory evidence adduced at the bench trial, the Court reaffirms that holding as a finding of fact.

The second issue is more vexing.  There is something deeply troubling about this set of transactions.  Terry undisputedly paid off the 2009 mortgage but did not receive a satisfaction.  Instead, Teves claims the parties agreed to revive that mortgage when Terry ostensibly sought a loan for $200,000 but the 2010 note and mortgage reflect only a second $100,000 loan.  The only document that supports Teve's theory—and then only obliquely—is the extension.  In addition to the dispute about Terry's signature, however, that agreement is odd on its face: Why would Terry agree to extend the payment schedule on a loan that he had already paid off?

In addition, based on an assessment of Schwartz's and Terry's credibility at the bench trial, as well as the implausibility of the misspelling of his own name, the Court credits Terry's account that he did not cash the $80,000 check, for reasons known only to Reich.  This lends further support to the Court's conclusion—which it now adopts as a finding of fact—that Terry did not sign the extension agreement.

5

## CONCLUSIONS OF LAW

### A. Liability for Principal

Based on the foregoing findings, the Court concludes that Terry's undisputed payment of the 2009 loan satisfied the 2009 mortgage. Therefore, that mortgage is no longer valid and cannot be foreclosed.

By contrast, there is no legal or factual defense to the 2010 mortgage. Terry admits receiving $91,864 in connection with that loan and not paying it back. That alone entitles Teves to foreclose, just not for the $171,864 it claims at principal.

### B. Liability for Prejudgment Interest

Teves seeks prejudgment interest of 24% per year since 2010. Even on the reduced principal, that more the quadruples the debt to over $400,000.

Because foreclosure is an equitable remedy, the allowance of prejudgment interest is a matter of discretion. *See Dayan v. York*, 859 N.Y.S. 2d 673, 674 (2d Dep't 2008). Thus, courts have disallowed or reduced prejudgment interest where the party seeking it has engaged in dilatory practices designed to increase it. In its summary judgment decision, the Court concluded that Teves and Terry were equally responsible for the admittedly lengthy delay in this case. *See Teves*. 2021 WL 3912297, at *2.

However, having heard the evidence at trial, the Court concludes that Reich's and Schwartz's business practices justify a 50% reduction in prejudgment interest. Teves admits that Terry borrowed and repaid $100,000 but claims that he then borrowed $200,000 a few months later. In normal circumstances, this would have unfolded as follows: Terry would have received a satisfaction of the 2009 mortgage. Upon closing of the second loan, he would have executed a note and mortgage for $200,000. Nothing could be more straightforward.

Instead, Terry received no satisfaction of the 2009 mortgage. When the second loan closed, the documents referred to a debt of only $100,000. Even the disputed rider does not mention $200,000. And instead of receiving one check for $200,000, Terry received *three* checks totaling, not $200,000, but $191,864, because Reich needed to take something off the so-called back end, whatever that is.

Although Teves offered an explanation for this loan structure, the Court has found it incredible. In addition, it draws the inference that it was designed by sophisticated businessmen in an unconventional moneylending business to deceive an unsophisticated borrower—or at least create a dispute that has proven impossible to completely untangle. While the Court cannot completely disregard Terry's admission that he received $91,864 from the transaction, it concludes that

7

equity cannot countenance 14 years' worth of 24% interest in these circumstances.

Accordingly, the Court will award prejudgment interest, but with a 50% reduction to $154,331.52 ($91,864 x 0.24 x 7).   Adding the principal, Terry's total debt to Teves is $246,195.52.   The Court orders foreclosure of the 2010 mortgage and directs a receiver to be appointed and to sell the property at a duly conducted auction, with Teves receiving the aforementioned amount after a sale.

    **SO ORDERED.**

    _/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
April 29, 2024